Good morning. Mr. Paddock? Yes, and I'd like to ask the panel if I may reserve four minutes for rebuttal. Of course. Thank you. Your Honors, my name is Ryan Paddock. I'm an attorney and I'm representing a group of unhappy but yet very thankful women carpenters. They are here today toward the back of the courtroom. You know, they're unhappy because of everything that happened to them in the workplace. I gather the main point of contention is the authority that the union has here to place people in jobs. And so perhaps you should tell us why that's not the case. Well, Your Honors, there is testimony in the record that the union had power to assign jobs. And I could cite to those portions of the record, but each of the plaintiffs, as well as a non-party union member, Margarita Payden, who'd been with the union for 20 years, maintain that the union representative, Mark Dirkolak, was the gentleman who assigned them to job sites and to work. The union takes a different story, that they don't do the assigning, that it's the employer who does hiring. What does assignment mean? Does it mean recommend or does it mean hiring? When a work site has work available, they contact him or he gets in touch with them, and he finds the carpenters to send to the job site. And that is their understanding. That is how they testified to it. That's certainly one of the very many disputed areas of fact. Some of the statements made about, I can get work, I have jobs, but I can't give them to you, are indicative that Mr. Dirkolak recognized he had the power to give out jobs. That quote is? I thought the quote was, my people are still out of work. That was part of it. In another section, he also said, I have jobs and I can't give them to you. However, I have jobs the men don't want. You can have these jobs which have to do with installation work that the men didn't want. So those jobs were okay for these women to take. That was certainly a contested area of fact, that he had the power to assign those jobs, and he did assign those jobs that were less favorable, less desirable to the men. The dramatic decrease in hours, which was stipulated to, is undisputed. The actual hours worked, ranging from 35% of a decrease in hours in 07-08, compared to the prior years for Ms. King, and then all the way up to 88% decrease in hours. Back to Jessica's point, which I think had to do with causation, involving the union's decision and the loss of work. And the district court said that the plaintiffs might have enough evidence to satisfy the third requirement of this page 14. If only they could establish some causal connection between the defendants' conduct, stealing, and the adverse employment action. Why is it wrong? Because they are saying that the way the court looked at it, and the case they cited to Burlington, the trial court, and thankfully your honors look at this with fresh eyes in its plenary review, but the way the court looked at it there was from an employer's standpoint. They hung their hat on, they didn't have the power to hire and fire, when they spoke to the Burlington case, and that was one of the primary reasons that the union said, we're not responsible, we don't have the control, and basically the court accepted that. Rather than hearing from the women saying the union is discriminating against us, the court accepted that the union just pointed the finger and placed blame and said it's the contractors, it's the contractors, which didn't line up. Is there evidence, aside from the comments made, that the union was not referring any of the plaintiffs to the contractors' favor? That they were not referring? That they had the authority to pick the people for the jobs and didn't do so. Yes, there's testimony throughout the record. I believe I cite it on page three of my brief with a laundry list of citations to the record as to where the women said so. My question was, is there evidence that the union representatives, in fact, were not referring any of the plaintiffs for work assignments? That they were not? I'm not aware of anything that says that the union reps were not referring people for assignments. The record shows that all of the plaintiffs were referred at various times. In fact, many of them got most of their jobs through this way. Are there any instances, as Judge Fuentes asked, where they were denied a referral? None are coming to mind immediately, Your Honor. I think there probably were some places where they ended up going to a site and not getting the job. I thought the basis of your case is under statute that requires union representatives to make references of its members without discriminating on the basis of gender and race. Absolutely, Your Honor. My question basically is, do you have instances where that did not, in other words, that there was specifically gender and race discrimination in the decision not to refer any of the plaintiffs for work? Yes, Your Honor. Just in and of itself, the comments that, I can't refer you to these jobs, but I can send you to the jobs the men don't want. That was a direct statement from Defendant Derkulak to the lady carpenters. Your case rises and falls on those comments. It's not just the comments. It's the extreme drop in hours. Eighty-eight percent for one of these ladies from the years prior as far as the amount of hours she ended up losing coming into 07 and 08. It's that in combination with the things that they said. It's that my people are still out of work. I have to get my people work first before I can get work for you. Defendant Derkulak said that. That Defendant Coriell, when was asked, can I get new women to sponsor, sure. Did he say, I have to get my people work before I get work? That was implied. He said, my people are still out of work, and that was implying that he's taking care of his people first. I just want to focus on that statement because when my people, I understand the plaintiff's take. That can mean gender and race discrimination, but it could also mean my people meaning union members, couldn't it? Well, he was saying, you're not my people is how she heard it, and that's certainly something that's for the trier of fact to determine as to what does that statement mean. Did he say, you're not my people? Well, he may as well have. He said, my people are still out of work. That's why you're out of work because I can't get work for my people. My people come first is what he said, and the trial court judge interpreted that to mean, well, he just didn't identify with the black female carpenters. He might identify more with people in his own socioeconomic group or racial group, et cetera, and that's the problem. That's the problem. If he's giving out preferential treatment because of who he identifies with and that falls on sex or racial lines, that's the real issue. And apparently, that's what they were doing, and certainly that's something for the trier of fact. If I may, because I know I'm running short on time, I just wanted to touch very quickly on the retaliation claim. The defendant, Derkulak, changed his story about the retaliation after the lady spoke, Ms. Tanya Mitchell and Sinequa Butts, spoke at the mayor's commission in Philadelphia. He initially in his deposition said – When did they speak at the mayor's commission?  When did they speak at the mayor's commission? That was in June of 2008, and they were complaining of being discriminated against. And how soon thereafter was their perception that an adverse action took place against them? Less than a month. And actually in his deposition, Mr. Derkulak says that as a result of the mayor's commission meeting, he requested one of the signatory contractors to issue a letter saying why they weren't working there anymore. And that letter at his request, that letter that came at his request, then went on to say bad things about them. And then later in his declaration – As I recall, what started that wasn't somebody from the media calling Derkulak and putting pressure on him, saying, well, what evidence do you have? And apparently all he had was anecdotal evidence, so he went and asked for a letter. That might be the case. But what the key is, is that Derkulak, after that, in his own declaration said that he had the letter prior to they ever testified at the mayor's commission. He changed his story about that. That's something that's for the trier of fact to determine whether he's credible or not. You can't just say whether or not he changed his story because it can appear retaliatory. That's for the trier of fact. He changes his story as to – of Ms. Mitchell and Ms. Butt before the commission. It may be that he was trying to not put that out, and he only put it out because he was being given such pressure by the person from the news media. I don't know what his reason was, Your Honor, but as far as speculation goes in determining what the facts really are, that's really for the jury. And I'm thankful that Your Honors have point of review as far as these various facts. And the court has, in cases where the union has said it's not us, it's not us, it's the employers, it's the employers, the court has granted remedies in the past. The Third Circuit in U.S. v. International Union Elevator Construction, where the union had said most of the hires come from hires on the street and direct hires. The court imposed quotas for hiring of black workers and referral work hours. But on the union? Yes, Your Honor. But it would have to be on referrals because they don't have the authority to hire. Right. Imposed quotas on union for referrals? Right. What court was that? That was this court, the Third Circuit in U.S. v. International Union Elevator Construction. Oh, that's a different case. Yeah, but that was very clear evidence where they had not hired any black workers for a significant period of time. It's not because the union was only a union. Over a very significant period of time. And then there was a very significant amount of hiring after the case. Because of the quotas that were imposed, there was. But I cite that as an example as to where the union said, it's not us, it's not us. Also, there's a case from the Western District. But the statistics prove that it was in that case. Right. And the drop in hours combined with these various discriminatory statements directly from the defendants, these aren't statements from the contractors. That's a significant drop in hours in this case. Yes, absolutely. From the 03 to 06 and to 07 and 08. For most of the women, they're 60 to 80-some percent, 88%. For Ms. King, they're somewhat less. And I see I'm out of time. Any questions? We'll have you back.  Thank you very much, Mr. Paddy. Mr. Gelman. Good afternoon, Your Honors. May it please the Court, thank you for allowing me to speak. I represent the appellees. That would be the Carpenters Union. Could you touch on that last point? Pull the mic up a little. That's it. I'm sorry. That last point about the figures, because I thought that seemed like a significant drop in terms of the average hours worked by females. It's not according to race, it's according to gender, but certainly female workers took a big hit in terms of referrals by the sheet. Well, Your Honor, I do take issue with the manner in which you phrased your last comment. The female workers appeared to take a big hit with regard to the hours worked. However, I do not concede or agree with your representation that the female workers took a big hit with regard to the referrals by the union. That's obviously a significant distinction, and the distinction which brings us here today. There is clearly the numbers speak to a decrease in work hours by females in 2007 and 2008. Again, we must keep in mind the statistics from where they derive. They are contribution hours for signatory contractors made to the benefit funds on behalf of particular employees. This is not a measure. This is not a strict measure or even an incidental measure of referrals per se. What this simply means is these are the individuals who were working for signatory contractors during these years and the contributions that were made on their behalf. This doesn't tell any complete story. In fact, the numbers are, as Judge Bailson recognized, essentially valueless in their raw nature, in that we do not know from these numbers how these individuals obtained the work, why individuals were laid off and, quite frankly, whether male, female workers, regardless of gender. We do know there's a huge disparity between the male and female carpenters who were referred to work. I'm sorry, not referred to work. Hours worked. Who actually got hours to work. That's correct, Your Honor. Do you have the comparison of the numbers for referrals? No, we do not. In fact, there are no statistics regarding referrals, and that goes to a point that Judge Fuentes made earlier in the discussion with regard to evidence. So if there's no statistics regarding referrals, then we probably have to go back to the hours worked, do we not? Well, that's a fact that may warrant consideration, but you have to look at the individual, and this is, again, a fact that Judge Bailson rested upon. You look to each individual worker is going to have his or her own set of circumstances. For example, a worker, be it male or female, leaves this jurisdiction in 2007. Their numbers will be recorded as zero. That would fall into their averages, and obviously if they'd be female, the numbers would weigh heavily in the negative manner. Or if they go to work for a non-signatory contractor, they go on the side, break the rules of the union, go work, perform construction work for a non-signatory contractor. The numbers do not appear. They're not factored, and there's no consideration. More pointedly, with regard to the particular plaintiffs in this matter, and it's illustrative of the problem we have with these statistics, which, by the way, were not examined or referred to any expert witness. There's no expert or any other witness affidavit part of the record to consider these numbers, and were left essentially as guesswork. But with regard to the particular plaintiffs, we have Plaintiff King, who experienced an on-the-job injury in 2008 and was unable to work for over a year. She took the same plaintiff. I mean, the point is that they're saying, okay, fine. There may be other things. Maybe somebody's injured. It could be a pregnancy, whatever. But when the slate is clean and there's no injury or no other being out of work, let's take 07, there were significantly fewer hours worked. And then you take that, which may not be, you know, enough, but you take that and you combine it with some of the statements being made, my people are still out of work, which although Judge Belson interpreted it one way, you know, it could be interpreted, as the plaintiffs did, that the person who made the statement that Dirk elects people come first. He's going to take care of his people first, whatever that means, before he takes care of these particular plaintiffs. Now, they might not win, but why shouldn't that get to a jury? Your Honor, as was recognized, the issue here is one of referral. Fail or refuse to refer, which would affect an individual, somebody in a protected class' ability to work. Whether the union – The comments that the plaintiffs make allow us to give that a little bit more consideration. Okay. We have three stray comments over the course of six years, five different plaintiffs. So we have essentially, and they were all touched upon earlier in the argument, three stray comments. And I believe that we need to examine the record to see precisely what those comments were and the context in which they were offered. You still haven't answered my question. Certainly. With regard to Mr. Dirk elect's statement. Why isn't it that – why should a judge, a summary judgment, make a call as to what those statements mean? Why shouldn't a jury make that call? If the facts of record, the well-established, undisputed facts of record, overwhelming facts of record, speak to the fact that the union does not have the ability to refer cases – I'm sorry, to affect – they do have the ability to refer, obviously – to affect the hiring and firing of its members with regard to individual employers. Three stray remarks which could be interpreted by counsel's own admission they were the understanding of the plaintiffs. And because remarks can be interpreted – I'm missing something. Certainly. I'll get to the specific comment. If a union – I'm not saying this union has done it – but if theoretically a union gets together from time to time, oftentimes just very informal, you know, phone calls, and it's pretty clear that there's an understanding between the union and certain employers that I am not going to refer to you as a union any persons who are minorities. If that's the case, you're telling me that the union can't be held liable because it doesn't do the hiring or what? No. Under those facts, Your Honor, the union certainly would be subject to liability. Those aren't clear facts. And they've made claims that, in effect, are suggesting that, and they're saying what we're focusing on are the number of actual hours that the plaintiffs got, and that there were comments made that you could take perhaps one way or the other. The point being, why should the judge at summary judgment make the determination as to what those comments make – It's a material issue of fact, in other words. When Judge Bayleson considered whether the plaintiffs had met their burden of establishing a prima facie case of discrimination, he looked to the evidence to determine whether or not there was any facts offered to prove that it was within the control of the union and its representatives to engage in an adverse employment action. But what he found was that the prima facie case was that, under the third and fourth provisions, there was no adverse employment action and that others not of the protected class were not subjected to the same adverse actions. Precisely. So there was no evidence that they had the ability to effectuate the adverse employment action. And the three stray remarks, when read in context, and I believe they were misquoted early in the argument, did not lend themselves one way or the other to disproving what Judge Bayleson found to be uncontroverted evidence. So you're saying here the union had no ability to make the decisions on hires. Correct. But their point is more nuanced than that. They're saying that that's true, but the union could have an understanding with certain employers as to who gets recommended or referred to the employer for work. Certainly. And they're entitled to a theory. A theory doesn't get you before a jury. But there's absolutely no evidence in support of that theory that there could be some side understandings. There are approximately 12,000. No, I mean Dirk Alec's comment. Dirk Alec's comment. Could be construed one way or another way. Ellen, my people are out of work. First, we have the discussion as to who my people are. Could they be on a particular trade, a craft, a subset of the union, whatever that case may be. But there is nothing suggested in his statement that he is getting, that he is arranging or effectuating work for males or somehow enhancing the scope of male employment to the detriment of female employment. Couldn't my people be taken to mean white male carpenters? It could. And Judge Bailson considered that implication, said even if you take it as I'm a white male. These are my people. You are not my people. My people are out of work. Everyone's out of work. What would you like me to do? There's nothing that could be done. And Judge Bailson said that was equally probative. Said that was in fact equally probative. Your interpretation may be the right one. That may be exactly what Mr. Dierkelecht meant. But I keep coming back to whether this should be decided by a judge at summary judgment or it should be decided by a jury. I understand your concern, Your Honor. And that's why we need to look rather than focusing upon the three straight comments, which, by the way, need to be precisely analyzed and within the proper context. The assertion per Miss Budd at her deposition that Mr. Dierkelecht stated, I got these jobs, but I can't give them to you. She agreed that she never asked him what jobs he was referring to or what he meant by the he could give the job to her. Now, we could sit here all day trying to surmise what that could have meant. And I understand the plaintiffs would like a jury to consider that evidence. But in the absence of the ability to effectuate an adverse employment action. I mean, it was put into, I mean, Bronson, for example, testified that she interpreted that to mean, quote, that she was not a white man and that those were the ones that was his people. That she, quote, was not a part of that clique, close quote. And that, quote, she felt as though she was being discriminated against because of that fact, close quote. So she's reading it very differently. Well, she certainly is. And as her attorney first noted, she's unhappy. But the judge is supposed to construe statements in light most favorable to the non-moving party. Here are the plaintiffs. Understood. And if done so, one could surmise that in making that statement, Mr. Dierkolek is not colorblind, that Mr. Dierkolek recognizes a distinction between races or gender. But that unto itself is independent of his ability or any evidence of record of his ability to do anything beyond offer a referral. And as Judge French. Were they deposed? Pardon me? Were they deposed? Dierkolek was deposed? Yes, he was, Your Honor. Did he offer an explanation for that comment? Like, I got jobs, but I can't give them to you? No, he didn't. Did not, Your Honor. But what we do know with regard to the referral of these plaintiffs in particular. So Dierkolek was deposed, but he didn't give an interpretation. Was he asked? He was not asked by a plaintiff's counsel, Your Honor. All right. With regard to that statement or any of the other statements. Did you ask him to give, were you counsel below? Were you counsel? Yes, I was, Your Honor. Did you ask him at the deposition as to what he meant by that statement? I did not, Your Honor. All right. But what we do have, what we do know. So then the only thing in the record is Ms. Bronson's statement, right? Is Ms. Bronson's interpretation of what she believed it meant. Correct. Yes, Your Honor. That's the only evidence we have. Well, I couldn't, I, yes, Your Honor. So if that's the only evidence we have and we don't have a competing interpretation, I guess the only thing that the district court could say was maybe that was just a stray remark, but that's pretty tough to do even though the court did it here. Well, that's exactly what the court did say in that that statement proves, if taken in a nefarious light, if interpreted in that manner, that men are out of work, women are out of work, everyone needs jobs. Let me ask you, were all of the plaintiffs in this case, were they housing inspectors or were some of them? They, none were housing inspectors at the time of the litigation, the point in question 2003 to 2008. Some have since left the union and they've become housing inspectors, but they were all carpenters at the time. And there's a difference, and that's an interesting point, Your Honor, getting back to the work obtained by the plaintiffs during the time period in question. Almost 90, when you take out the apprenticeship with the PHA, almost 90% of the work, of the carpentry work, performed by the plaintiffs was a result of direct referrals by the union, by Mr. Dierkelec and other business representatives. For the individuals to claim that there was, it was within the ability of Mr. Dierkelec to prevent them from getting work and that he was not taking the appropriate steps, I think is certainly obliged by the record. One final point, Your Honor, with regard to the retaliation, just a statement that was made. Let me ask you a question on retaliation. You didn't explicitly address the retaliation claim in your brief, did you? I mean, I don't see it even mentioned, the word retaliation even used maybe twice in your brief. The retaliation claim was, it goes, Your Honor, to, I believe the answer to your question is yes, I agree. That goes to the adverse employment action, Your Honor. The question from you is when did the adverse employment action occur? You were trying to establish a temporal context, and counsel's response was approximately one month later. That's not the case. There was no adverse employment action. That is with regards to the letter to the employer and the confusion over when the letter was in possession and the letter that went to the press. That is not an adverse employment action. The retaliation claim requires an adverse employment action, which brings us back to the underlying and larger issue here is whether there was an adverse employment action. Well, what was the actual timeline? What was the time from the testimony of Budd and Mitchell before the commission to the alleged adverse employment action was how long then? Well, Your Honor, our position is there was no adverse employment action. The adverse employment action is the inability. No, but you're saying even if there was an adverse employment action, it was just so far removed from the testimony. No, I'm sorry. If that's what I represented, then I misspoke. My position is clearly there was no adverse. I'm saying, Your Honor, that the letter to the press from the employer does not and could not constitute an adverse employment action under the law, the standard for adverse employment action. That did not affect the terms and conditions of their employment. In fact, they were not employed at the time. That was simply bad press, if you will. The adverse employment action would be with regard to their retention of their employment or their obtaining of employment. So we're dealing with apples and oranges. And if the underlying argument that we present is credited, then the retaliation claim must obviously fail. And what's also important to note in that same realm is that, and as Judge Bailson recognized, is that the average hours worked by the plaintiffs themselves on numerous occasions were higher than those worked by male partners, if you're crediting the statistics put before you. I wanted to ask you a question about that. Sure. One point, because I remember what you said about, to explain the fewer hours that women were working, that there were many reasons for it, including illness, injury, et cetera. In 2004, the women actually logged more hours than the males, 1302 versus 1288. So they were doing more. That's correct. In a period of three years, there was this precipitous drop down to 745, something like, my math is terrible, but I thought about 40%. Could you explain how, I mean, that 40% drop isn't explained by injury? Certainly. Well, it can be explained with regard to Plaintiff King and Bronson. Plaintiff King was out of work for approximately a year for an injury, and Plaintiff Bronson missed, between 2007 and 2008, approximately nine months due to pregnancy and illness, health-related conditions. So with regard to those two, I can. With regard to males and females and the thousands of members otherwise, I cannot. It's a great deal of conjecture that anyone in this room can offer with regard to the economic downturn of 2007. Perhaps an employer had a mixed workforce of male and female employees, and when layoffs started to come, laid off the female employees first. I don't know. But what I do know is the position taken by the appellants with regard to the decrease in hours, to the extent that it would be credited that there was some gender-based decision-making on the part of the union, and more importantly, that the union possessed the ability, that would suggest that there was no discriminatory intent, no discriminatory actions on the part of the union through 2007, and for whatever the case may be. And by the way, the EEOC complaints filed by the plaintiffs all took place in 2008. So that would mean to suggest that for whatever reason, discriminatory intent by the union and its representatives somehow developed or was born at this point in time for some unexplained reason, which happens to coincide with the financial crisis and the precipitous drop in construction projects throughout the jurisdiction. It really doesn't make sense. But the comparison, if 04 was very slightly, the plaintiffs had slightly more work, but they went down 40 percent, the comparison class went down how much after 04? The comparison class? In other words, white males. Well, we don't – race, these statistics bear no relationship with race. What was the 1288 then in 04? What was that class? What did it consist of? I – okay, 2004 we have 1288. Those were the male workers. 1302 for the female. So if the females went down approximately 40 percent, if that number is correct, the males went down comparatively how much after 04? I don't have those statistics. I have the roll numbers here. I don't have the percentages in front of me. No, but they did go up. They went up. Well, it – So one goes down 40 and the other goes up, but no – making no sense. Right. And, well, that's – unless there were – it doesn't make sense unless you look at the individuals that were applying for work and the particular employers that were hiring them at that time or choosing to lay them off. Of course, we have hires. What's not considered is who was then laid off and what hours not reflected. Certainly. So you could – the numbers – as we look at these numbers, they exist in a vacuum. We can put our spin on them, as I did in our brief. Planners can put their spin on the numbers, and we could sit here all day trying to engage in guesswork. I mean, Theresa Howard, for example, one of the planners – There was no expert testimony on the statistics. Is that correct? None, zero. Theresa Howard in 2004 worked 664 hours. In 2005, she worked 1,583 hours, an over 100 percent increase. What's the reason for that? I can offer no explanation. There may be specific circumstances with regard to Theresa Howard's workability skills or whatever the case may be. The point is, does that 100 – is that 100 percent increase credited to the union and their altruism? No, it just happens that way. And through the thousands – 12,000 union members, hundreds of contractors, thousands of work projects, not a single person, not a single statement, not one deposition of anybody – a steward, a foreman, an owner, a project manager – to say, yeah, well, the union says you have to hire them, and we hire them. Not one. And I think that lack of evidence is – cannot be ignored, even when faced in the light of truth. This is referrals, isn't it? Yes, it is. Any other questions? We're good. Thank you very much, Mr. Gelman. Thank you. If I may, Your Honor, in regard to the statistics, a good reason why there was no expert testimony regarding the statistics is those statistics were undisputed by the defendants for purposes of summary judgment. And that being said, the statistics, as they were presented, still should be taken in the light most favorable to the plaintiffs. And as they were undisputed, it's hard for the defendants – I ask the question not because the statistics were undisputed or disputed, but what they mean. Sure. How should they be interpreted? Yeah, and there's a lot of questions that were asked, what if this and what if that. But as far as Theresa Howard goes, Mr. Gelman did mention her as far as the increase between 04 and 05. She – and I believe the record will bear this out – she didn't begin to finish her apprenticeship until late in 04 and then started to get the hours at that point. So she didn't do a full year in 04. However, that explains her 04 numbers. Additionally, there was testimony about Mr. Derkulak getting calls from contractors and saying every time a woman carpenter's name comes up, the contractor says next. And he just goes on and reads the next name on the list. Now, there's also case law where not that the union has to police the employers, but they do – they can't be complicit in discrimination. How would they – I'm sorry, you're saying they can't police them. They don't have to. The case law is clear. They don't have to go around and police the employers. But if they become aware of discrimination on the employment sites, they can't just sit idly by and say, not us, not us, as was their defense here. If the contract says next, what is their response? What is the union representative's response? The union representative would have to pose a way to deal with whether or not they believe there's discrimination taking place in the workplace. And they would have to say why. What's the situation? You're passing over every woman, something to that effect. There should be some appropriate response. They can't just be complicit and say, oh, well, I went along with it because the person with the final say gave the order. It's not me. I just went along with somebody who had more authority than me. It's okay to discriminate as long as somebody higher up the chain is okay with the discrimination. And I could point at the person who's higher up the chain and say they made the decision, not me. It wasn't me doing the discriminating. That's not the right role. And there's a case from the Western District from 2010 I'd like to hand up, Hubbell v. World Kitchen. And I did email Mr. Gilman about this case when I found it. It was not included in my brief. It refers over to a Tenth Circuit case that speaks to the and it gives a good analysis of when a union may be liable for being complicit in discrimination by the employers where it is the union doing the discriminating. One last thing. We, my people are still out of work. If he was being inclusive and including the black women carpenters in that comment, Mr. Derkulik, he could have said we are all out of work. She's still part of the union. What's the reason for the non-inclusive language that's really for a jury to say what did he mean by my people rather than saying, hey, we're all out of work. She was obviously not included in his people. That and the record and the hours, which were undisputed for purposes of motion for summary judgment, as well as the changing story regarding this retaliatory letter that was sent, whether it was in his possession, whether it was something he requested after the fact of the Mayor's Commission, I'd ask the court to send this case back. And given that you have plenary review to look at all the facts and to allow these women to have a day in court and let a jury decide the facts. Good. Any further questions? Good. You can certainly hand up that case. And, Mr. Gelman, if you want to respond, we'll give you 10 days to file a letter of response to this. Good. Thank you. Thank you. Good. We thank counsel for a very helpful argument. We'll take the matter under advisement. All right.